Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 899 | **DATE** | 7/3/2002 |
| **CASE TITLE** | TOM CACCAMO vs. GREENMARINE HOLDINGS LLC | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Status hearing held. Enter Memorandum Opinion And Order. Greenmarine's motion to dismiss is granted without prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 5 number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | JUL 0 8 2002 date docketed | |
| | Notified counsel by telephone. | | | |
| ✓ | Docketing to mail notices. | | UM docketing deputy initials | 58 |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK 02 JUL -3 PM 4:31 | JUL 0 8 2002 date mailed notice | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | UM mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TOM CACCAMO, JOHN FLESHER, RICHARD )
KOLB, and CY WERDA, on behalf of themselves )
and all other similarly situated, )
)
Plaintiffs, ) No. 01 C 0899
)
v. ) Judge John W. Darrah
)
GREENMARINE HOLDINGS LLC, et al., )
)
Defendants. )

DOCKETED
JUL 08 2002

DOCKETED
JUL 08 2002

## MEMORANDUM OPINION AND ORDER

Plaintiffs, former employees of Outboard Marine Corporation ("OMC"), filed a class action suit against Defendants, alleging Defendants violated the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. §§ 2101-2109. Before the Court is Greenmarine's Motion to Dismiss.

OMC is a Delaware corporation based in Waukegan, Illinois. OMC conducted its operations from over thirty manufacturing, distribution, warehouse, and office facilities worldwide.

On or about September 11, 1997, Greenmarine completed a takeover of OMC. Greenmarine acquired 91% of OMC's outstanding shares. Greenmarine is a limited liability company. The members of Greenmarine are Greenlake Holdings LLC "(Greenlake"), Quasar Strategic Partners LDC ("Quasar"), and Quantum Industrial Partners LDC ("Quantum"). Greenlake, Quasar, and Quantum have approximately 30.5%, 34.75% and 34.75% interest in Greenmarine, respectively.

Greenlake is controlled by Alfred D. Kingsley ("Kingsley") and Gary Duberstein ("Duberstein"). Kingsley is the Chief Executive Officer ("CEO") and President of Greenmarine.

58

Duberstein is the Vice President, Secretary, and Treasurer of Greenmarine. Quasar and Quantum, along with several other companies, are generally known as the Soros Group. Greenmarine is a Delaware Corporation with its principal executive offices in New York.

Immediately after the acquisition, Greenmarine demonstrated its intention to take control of OMC's operations. On the "Control Date", OMC's Board of Directors would be transformed to include four designees of the Greenmarine and Greenmarine Acquisition Corporation ("GAC") and two designees of OMC. Kingsley assumed the chairmanship of OMC. Greenmarine then hired David D. Jones as the President and Chief Executive Officer of OMC; and Richard Katz ("Katz"), a member of the Soros Group, assumed the position of Vice Chairman of OMC.

In an interview in September 1997, Duberstein and Kingsley stated, "We want to take {OMC} back to its glory days." That same month, Katz stated, "We're absolutely committed to restoring {OMC} to profitability." In November 1997, Kingsley announced, "We're in the engine and boat business." By the end of 1997, the Soros Group stated that it had "assumed full control of [OMC]...."

In December 1997, Greenmarine and OMC closed a Tennessee boat-building plant, eliminating approximately 400 jobs. In April 1998, Greenmarine and OMC announced a further reduction in workforce by eliminating 200 jobs throughout the company's worldwide locations. At this same time, Greenmarine and OMC began to identify the causes of certain performance issues associated with engines utilizing the FICHT technology. In response, Greenmarine and OMC prepared and distributed upgrade kits to dealers.

In September 1998, Greenmarine and OMC declared that, over the next two years, they would close OMC's two largest engine manufacturing facilities. As a result of the closures, the

2

company anticipated the elimination of approximately 900 jobs.

In January 1999, Greenmarine and OMC completed their analysis of the FICHT engine issue and determined that certain further technological improvements were needed to improve overall performance of the FICHT engines. Additional upgrade kits containing performance enhancements were provided to dealers in April 1999.

In 1999, OMC also began outsourcing production. However, OMC experienced significant difficulties in transitioning production to third-party vendors. As a result, full production capabilities for certain engine components took longer than anticipated. Greenmarine and OMC significantly curtailed production from February to July 2000 as they worked without source vendors with production and other quality issues. During this time period, OMC reported substantial losses.

As OMC's business began to falter, Greenmarine, and specifically the Soros Group, invested $65 million in OMC in the beginning of 2000 and another $20 million in May 2000. By the end of 2000, the Soros Group had invested $120 million into OMC to keep the company afloat.

On December 5, 2000, the company announced the termination of approximately 1,000 of its 7,200 employees at all levels. On December 20, 2000, Greenmarine and OMC further reduced OMC's workforce by temporarily laying off 700 hourly factory workers at its Waukegan, Illinois plants. Greenmarine and OMC also announced the possibility that not all of the 700 laid-off workers would be called back to work.

On December 21, 2000, Greenmarine and OMC distributed notices to its employees announcing the permanent layoff of approximately 1,190 employees at OMC's corporate offices and manufacturing plants in Illinois. Greenmarine and OMC also terminated approximately 4,000 OMC white-collar employees across the country. In the end, 600 to 700 employees remained at the

3

corporate headquarters and at several manufacturing plants. On December 22, 2000, OMC filed bankruptcy.

**I. Motion to Dismiss For Lack of Personal Jurisdiction**

Greenmarine argues that this Court lacks personal jurisdiction. Plaintiffs are residents of Illinois and former employees of OMC in Illinois. Greenmarine is incorporated in Delaware and has its principal executive offices in New York.

The plaintiff bears the burden of demonstrating the existence of personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275 (7th Cir. 1997) (*RAR*). The allegations in the complaint are taken as true unless controverted by the defendants' affidavits. Any conflicts in the affidavits submitted by the parties are resolved in the plaintiff's favor. *See Berthold Types Ltd. v. European Mikrograph Corp.*, 102 F. Supp. 2d 928, 930 (N.D. Ill. 2000), citing *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987).

In cases involving federal questions, a plaintiff must show that (1) the defendant is amendable to service of process and (2) the exercise of personal jurisdiction over the defendant comports with due process under the Fifth Amendment of the United States Constitution. *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 833-34 (N.D. Ill. 2000) (*Euromarket*).

The Illinois long-arm statute provides, in part, that personal jurisdiction may be exercised over defendants that commit certain enumerated acts within Illinois or "on any other basis ... permitted by the Illinois Constitution and the Constitution of the United States". 735 ILCS § 5/2-209(a)(2), (c). Because of this broad statute, "the statutory analysis collapses into a due process inquiry, and [the court] need not consider whether the defendants engaged in any of the acts

4

enumerated in the long-arm statute". *Euromarket*, 96 F. Supp. 2d at 834, *quoting LFG, LLC v. Zapata Corp.*, 78 F. Supp. 2d 731, 735 (N. D. Ill. 1999).

The Fourteenth Amendment Due Process Clause permits a court to exercise jurisdiction over a nonresident defendant only if the defendant has had "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), *quoting Milliken v. Meyer*, 311 U.S. 457, 463 (1940); *Neuman & Assoc. v. Florabelle Flowers*, 15 F.3d 721, 725 (7th Cir. 1994). This determination depends on whether the plaintiff asserts general or specific jurisdiction against the defendant. *RAR*, 107 F.3d at 1277. "General jurisdiction ... is for suits neither arising out of nor related to the defendant's contacts, and it is permitted only where the defendant has 'continuous and systematic general business contacts' with the forum state." *RAR*, 107 F.3d at 1277. Specific jurisdiction "refers to jurisdiction over a defendant in a suit 'arising out of or related to the defendant's contacts with the forum.'" *RAR*, 107 F.3d at 1277, *quoting Helicopteros Nacionales de Columbia, S.A. v. Hall*, 486 U.S. 408 (1984).

In the instant case, Plaintiffs do not allege that Greenmarine had "continuous and systematic" contact with Illinois. As a result of their failure to raise issues of general jurisdiction in the complaint and in their response to the Motion to Dismiss, Plaintiffs have waived any general jurisdiction arguments. *See RAR*, 107 F.3d at 1277.

Specific jurisdiction exists if: (1) the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) the claim arises out of or is related to those activities; and (3) the assertion of personal jurisdiction is reasonable and fair. *See Euromarket*, 96 F. Supp. 2d at 834.

Purposefully Availed Itself Of The Privilege Of Conducting Activities In The Forum State

The critical issue in this first requirement is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). This requirement is not met if the defendant's conduct and connection with the forum state is the result of "random", "fortuitous", or "attenuated" contacts with the forum state. *See Burger King Corp. v. Redzewicz*, 471 U.S. 462, 475 (1985).

Plaintiffs argue that the totality of Greenmarine's contacts with Illinois meet this first requirement. These contacts include: (1) Greenmarine's acquisition of OMC; (2) executives of Greenmarine occupied some of the seats on OMC's Board of Directors; (3) Greenmarine's role in putting together an OMC management team; (4) Greenmarine's officers and directors made certain hiring, firing, and promotional decisions; (5) Greenmarine and Soros Group personnel had offices at OMC.

"[P]ersonal jurisdiction cannot be premised on corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary." *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000) (*Central States*). The determination the court must make is just how much control is enough to constitute "an unusually high degree of control". In making this determination, the court must be mindful that the general rule assumes some degree of control, direction, and supervision of a subsidiary in a normal parent/subsidiary relationship. *See IDS Life Ins. Co. v. America Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) (*IDS*).

Two different approaches are utilized in determining how much control is enough. *See LaSalle Nat'l Bank v. Vitro*, 85 F. Supp. 2d 857, 864 (N.D. Ill. 2000) (*LaSalle*); *Gruca v. Alpha Therapeutic Corp.*, 19 F. Supp. 2d 862, 866 (N.D. Ill. 1998) (*Gruca*). The first approach is the traditional test for piercing the corporate veil. *See IDS*, 136 F.3d at 540; *LaSalle*, 85 F. Supp. 2d at 864; *Gruca*, 19 F. Supp. 2d at 866.

When determining whether to pierce the corporate veil, a court applies the law of the state of incorporation. *See Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996). Here, Greenmarine is a Delaware corporation; therefore, Delaware law applies. Under Delaware law, the corporate veil may be pierced where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of the parent. *See Geyer v. Ingersoll Pub. Co.*, 621 A.2d 784, 678 (Del. Ch. 1992). Relevant factors in determining whether the subsidiary is merely an instrumentality or alter ego include: (1) whether the dominant shareholders siphoned corporate funds; (2) whether the corporation is a facade for the dominant shareholders; (3) whether the corporation was solvent and adequately capitalized; and (4) whether corporate formalities were followed, including payment of dividends and separate corporate records. *See Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205 (5th Cir 1995), *quoting Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537 (Del. Ch. Sept. 19, 1989). Piercing the corporate veil may only be done if it is in the interest of justice "when such matters of fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation ... are involved". *Pauley Petroleum Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968).

In the instant case, there are no allegations of fraud or that Greenmarine siphoned OMC corporate funds or that corporate formalities were not followed, including the failure to keep separate

7

corporate records. Greenmarine also provided the affidavits of Eric Martinez ("Martinez"), the Chief Executive Officer, Chief Financial Officer, and Senior Vice President of OMC, and Frank Sica ("Sica"), the Managing Director of Soros Private Funds Management LLC, member of the management Committee of Greenmarine Holdings LLC, and member of the OMC Board of Directors. Martinez and Sica aver that OMC was a self-contained and self-managed business. In addition, contrary to any status of inadequate capitalization, Defendants invested millions of dollars of additional funds into OMC to try to keep OMC viable. Lastly, Plaintiffs' assertion that the Greenmarine officers and directors that were also on OMC's board made decisions affecting OMC, including choosing vendors, halting marketing programs, closing plants, and hiring and firing personnel, fails to demonstrate that Greenmarine was an alter ego of OMC. OMC board members would have a role in these decisions, and merely sharing some executives does not demonstrate control to establish jurisdiction. *See IDS*, 136 F.3d at 540; *Gruca*, 19 F. Supp. 2d at 870.

The second approach for determining if sufficient control existed is whether the parent company has substantially controlled the subsidiary. *See LaSalle*, 85 F. Supp. 2d at 865; *Gruca*, 19 F. Supp. 2d at 866. Factors included in this analysis include: whether the parent company arranges financing for and capitalization of the subsidiary; whether officers and directors are the same; whether separate books, tax returns, and financial statements are kept; whether the parent company holds its subsidiary as an agent; the method of payment made to the parent by the subsidiary; and how much control is exerted by the parent company over the daily affairs of the subsidiary. *See LaSalle*, 85 F. Supp. 2d at 865; *Gruca*, 19 F. Supp. 2d 862, 867.

Here, there are no allegations: that OMC did not arrange for its own financing and capitalization; that OMC did not keep separate books, tax returns, and financial statements; that

8

Greenmarine held OMC as an agent; or that the method of payment made to Greenmarine by OMC establishes control by Greenmarine. The parties do not dispute that there was some shared directors and officers. As to the last factor, while Plaintiffs allege that Greenmarine made decisions affecting OMC, the allegations do not establish or raise the reasonable inference that Greenmarine exerted control over the daily affairs of OMC. The shared board members and directors, the acts of creating a new OMC board, and the effect the new board had on such issues of selecting vendors, terminating marketing programs, and the hiring and firing of certain employees are consistent with the normal relationship between a parent company and its subsidiary, in which parent companies may "control, direct, and supervise subsidiaries to some extent". *See IDS*, 136 F.3d at 540; *LaSalle*, 85 F. Supp. 2d at 866.

Based on the above, Greenmarine's and OMC's corporate formalities were substantially observed, and Greenmarine did not exercise an unusually high degree of control over OMC to establish that Greenmarine purposefully availed itself of the privilege of conducting activities in the forum state of OMC. Therefore, this Court lacks personal jurisdiction over Greenmarine. *See Central States*, 230 F.3d at 943.

## II. Motion to Dismiss Because Greenmarine Was Not an Employer Under WARN

In light of this Court's lack of personal jurisdiction over Greenmarine, the Court need not address Greenmarine's argument that the action should be dismissed because Greenmarine is not an employer under WARN.

For the reasons stated above, Greenmarine's Motion to Dismiss is granted without prejudice.

Dated: July 3, 2002

JOHN W. DARRAH
United States District Judge